42 F.3d 1401
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
David A. NORTON, Plaintiff-Appellant,
v.
Gary A. NAPPER, et al., Defendants-Appellees.
 No. 93-55325.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 4, 1994.
Decided Nov. 14, 1994.
 
 Before: D.W. NELSON and NOONAN, Circuit Judges, and KING*, District Judge.
 MEMORANDUM**
 David A. Norton (Norton) appeals the district court's grant of summary judgment for defendants in his suit alleging retaliatory termination of his employment. We affirm.
 In January 1984 Norton was hired as an Associate Civil Engineer in the Public Works Department of the City of Morro Bay, California. In September 1984 Norton became the city's Water Engineer, a position he held until April 1990. As Water Engineer Norton remained a member of the thirty-member Department of Public Works.
 Norton's first two years on the job were marked by smooth relations with his superiors. Problems arose, however, over Norton's perceived tendency to go behind the backs of higher officials in attempts to promote his ideas. On March 2, 1987, Gayle H. Nichols, Director of Public Works/City Engineer (the head of the Public Works Department), reprimanded Norton for discussing the Coastal Streams Diversion project--an idea for water development conceived by Norton--with the Mayor and City Attorney. The letter of reprimand alluded to other instances in which Norton made policy-related recommendations to high city officials without the backing of his superiors. For unspecified reasons the reprimand was later withdrawn.
 In an evaluation dated March 20, 1987, Nichols acknowledged the usefulness of Norton's ideas but noted (1) that Norton had accumulated a backlog of unfinished assignments, and (2) that Norton had not sufficiently accepted the laws, rules, and procedures that bound city employees. The evaluation was prompted by Norton's briefing of a City Council member on the Coastal Streams Diversion Project without advance notice to his supervisors. In a subsequent exchange of letters, Norton said he felt that "needless roadblocks" had been placed in the way of his efforts to develop new sources of water, and Nichols responded that Norton needed to work within existing procedural constraints.
 On July 31, 1987, Gary A. Napper, the City Administrator of Morro Bay, chastised Norton at length for "unprofessional and inappropriate actions" and "insubordination" in connection with the Coastal Streams Diversion project. According to Napper, Norton's "chronic" habit of making "end-run[s]" around the chief administrative officer of the city caused embarrassment and disruption in the management of city business.
 In a memo of August 5, 1987, Nichols criticized Norton for granting unauthorized interviews to two local newspapers. Nichols noted that the "content of your [Norton's] self-called press interview was factual and supportable, but its timing was premature." Referring to the Coastal Streams Diversion project, Nichols added, "Your actions seriously jeopardize the crucial inter-governmental relations necessary to accomplish this joint water project."
 Almost two years later, Nichols again criticized Norton for failing to check with his superiors before engaging in politically sensitive negotiations involving the Coastal Streams project. (Memo of April 7, 1989). Nichols' memo demanded that Norton obtain Nichols' approval before attending policy-related meetings, and threatened Norton with "disciplinary action, which could include suspension or termination," should he fail to comply.
 In July 1989 Norton publicly accused city officials, particularly Napper and Nichols, of hampering the development of the Coastal Streams Diversion project. Norton's charges led to the creation of an investigatory subcommittee of the Morro Bay City Council, but the results of the investigation were inconclusive.
 Finally, on April 17, 1990, Nichols advised Norton that he was subject to termination for having falsely stated that he was a registered professional engineer at the time the city hired him (January, 1984). According to California's Board of Registration for Professional Engineers and Land Surveyors, Norton registered as a Civil Engineer on April 2, 1971, but subsequently let his registration lapse beginning on December 31, 1981. Norton's final notice of termination stated that "[t]his action to terminate you is solely the direct result of your falsification of your job applications and of your continued dishonesty in allowing your employer to believe you had credentials which you did not possess." (Notice of April 24, 1990).
 PROCEEDINGS
 On November 9, 1990, Norton brought suit against city officials in state court on civil rights as well as contract and tort claims. Defendants removed the action to federal court on November 26, 1990; Norton's state claims were dismissed shortly thereafter. Norton filed a second amended complaint on June 24, 1991, alleging that defendants had deprived him of his First Amendment right of free speech in violation of 42 U.S.C. Sec. 1983.
 The district court granted the defendants' motion for summary judgment on November 17, 1992. Judgment was entered on December 14, 1992. Norton's motion for relief or reconsideration was denied on January 19, 1993.
 Norton timely appealed the grant of summary judgment and the denial of the motion for relief or reconsideration. This court's jurisdiction is based on 28 U.S.C. Sec. 1291.
 ANALYSIS
 I. DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT FOR THE DEFENDANTS?
 In granting summary judgment for the defendants, the district court relied on the doctrine of qualified immunity. The Ninth Circuit applies a two-part test to qualified immunity determinations: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993).
 A. Was Norton's Right to Engage in the Workplace Speech "Clearly Established"?
 For the law governing official conduct to be "clearly established," "[t]he contours of the [employee's] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The threshold determination of whether the law was clearly established is a "purely legal" issue. Mitchell v. Forsyth, 472 U.S. 511, 528 n. 9 (1985).
 The Supreme Court has sketched in broad outline the First Amendment rights of government employees. As the Court recently stated:
 To be protected, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to the " 'interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Connick v. Myers, 461 U.S. 138, 142 (1983) (quoting Pickering v. Board of Ed. of Township High School Dist., 391 U.S. 563, 568 (1968)).
 Waters v. Churchill, 62 U.S.L.W. 4397, 4399 (1994).
 Norton's speech touched on a matter of "public concern." By all accounts water policy is critically important to Morro Bay. The question here is how to "balance" Norton's interests as a citizen with the interests of the City of Morro Bay as his employer.
 The difficulty of such an inquiry in the context of qualified immunity is immediately apparent: Norton must show that his rights were "clearly established" under a First Amendment standard that was long ago acknowledged to be flexible and case-specific.
 Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged.
 Pickering v. Board of Ed. of Township High School Dist., 391 U.S. 563, 569 (1968). But neither is Norton's task impossible: the fluidity of the standard does not preclude a finding that the law was "clearly established." In Roth v. Veteran's Admin. of the United States, 856 F.2d 1401, 1408 (9th Cir.1988), this court rejected the contention that "public employees can never maintain a Bivens action alleging retaliation for exercise of their first amendment rights because adjudicating these claims requires particularized balancing." Analyzing Norton's claim entails looking for analogous situations in which employees managed to uphold claims of First Amendment rights.
 Pickering and Connick illustrate the balance between employee and employer interests in the context of workplace speech. In Pickering, a high school teacher was dismissed for sending a letter to a local newspaper criticizing School Board officials for their handling of revenue-raising proposals. The Court held that the termination was unlawful: "[A]bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S. at 574. Significantly for the present case, the Court noted that the teacher's letter raised "no question of maintaining either discipline by immediate superiors or harmony among coworkers." 391 U.S. at 570.
 Connick shaded the outcome the other way. The plaintiff in Connick was an Assistant District Attorney who circulated a questionnaire soliciting the views of her co-workers on a variety of personnel and managerial issues. The plaintiff's supervisor fired her for resisting an office transfer and for "insubordination" in subsequently preparing the questionnaire. 461 U.S. at 141. The questionnaire at issue involved a "public concern" in only a "limited sense." Id. at 154. While conceding that the questionnaire did not impede the plaintiff's ability to do her job, the Court stressed that "when close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Id. at 152. The context of the dispute also mattered in that
 [w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.
 Id. at 153.
 The topic of a public employee's speech and the disruption it causes must be considered in tandem: "[I]n Connick the majority emphasized that employers would be required to make an even 'stronger showing' of disruption when the speech dealt more directly with issues of public concern." McKinley v. City of Eloy, 705 F.2d 1110, 1115 (9th Cir.1983) (quoting Connick, 461 U.S. at 152)). Here, the importance of water policy suggests that the defendants must make a strong showing of workplace disruption. Such disruption, further, must be shown to be "actual, material, and substantial," Roth, 856 F.2d at 1407; it must be "real, not imagined," and "the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views." McKinley, 705 F.2d at 1115. Finally, this court has particularized the inquiry as follows:
 [W]hether the speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, and (v) obstructs the routine operation of the office.
 Hyland v. Wonder, 972 F.2d 1129, 1139 (9th Cir.1992) (Tang, J.), cert. denied, 113 S.Ct. 2337 (1993).
 
 
 1
 There was considerable evidence that Norton exasperated and embarrassed his superiors, and that he jeopardized City plans. The district court found:
 
 
 2
 [t]here is no triable issue of fact that ... Norton discussed water projects in private with third parties without his supervisors' permission. There followed a breakdown in the relationships between Norton and his supervisors ...
 
 
 3
 The memos from Nichols and Napper to Norton indicate that Norton's unauthorized comments impaired discipline, eroded working relations, interfered with the performance of office duties, and obstructed the routine operation of the office. See Hyland, 972 F.2d at 1139. Napper also alluded to "friction" between Norton and superiors, and complained that "embarrassing inter-governmental relations resulted from your [Norton's] actions." Nichols told Norton that "[y]our actions seriously jeopardize the crucial inter-governmental relations necessary to accomplish this joint water project." The district court did not err in finding no genuine issue as to workplace disruption.
 
 
 4
 Even though water policy was a fundamental matter of public concern, Norton's First Amendment interests were outweighed by the efficiency interests of the city government. Hence it was not "clearly established" at the time of Norton's termination that his workplace speech was protected by the First Amendment. See Waters v. Churchill, supra, 62 U.S.L.W. at 4399.
 
 
 5
 B. Does the District Court's Use of the Discarded Elder Standard Require Reversal?
 
 
 6
 In 1992, when the district court granted summary judgment for defendants, Ninth Circuit law held that in qualified immunity cases "the plaintiff has an obligation to produce legal facts from which the court can determine what the state of the law was at the point of time in the past when the incident occurred." Elder v. Holloway, 975 F.2d 1388, 1394 (9th Cir.1991). The Supreme Court subsequently granted certiorari and reversed: "[A]ppellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to or discovered by the district court." Elder v. Holloway, 114 S.Ct. 1019, 1021 (1994).
 
 
 7
 The district court based its grant of summary judgment on the now-discarded Elder rule. ER 195. The subsequent change in the law, however, does not in itself appear to require reversal. On appeal Norton cites cases not originally offered to the district court, see Brief for Norton 24-32, and this court has conducted its own search of the cases without reaching a result different from the district court's.
 
 
 8
 C. Did the District Court Err in Failing to Consider the "Pretextual" Basis for Norton's Termination?
 
 
 9
 As the district court noted, "that Defendants may have fired Norton on a pretextual basis appears irrelevant to whether Defendants violated Norton's 'clearly established' First Amendment rights." The "pretextual" character of Norton's termination should not be weighed in the First Amendment balance described above.
 
 
 10
 II. DID THE DISTRICT COURT ERR IN REFUSING TO GRANT NORTON'S MOTION FOR RELIEF FROM THE JUDGMENT OR RECONSIDERATION?
 
 
 11
 Norton sought relief from the district court's grant of summary judgment against him, arguing that a miscommunication prevented him from furnishing additional authority to the court. Motions for relief from judgment under Fed.R.Civ.P. 60(b) are reviewed for an abuse of discretion. Northern Alaska Environmental Center v. Lujan, 961 F.2d 886, 889 (9th Cir.1992).
 
 
 12
 Federal Rule of Civil Procedure 60(b) provides:
 
 
 13
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect ...
 
 
 14
 According to Norton, his failure to discover that the district court found his motion papers "unhelpful" amounts to mistake, inadvertence, and excusable neglect. The Rule comprehends a "mistake" made by the movant or "others." Fed.R.Civ.P. 60, Note to subdivision (b). However, "the court is generally under no obligation to notify a litigant of the status of her pleading." Cripps v. Life Ins. Co. of North America, 980 F.2d 1261, 1268 (9th Cir.1992) (Nelson, D.W., J.). Nor is the level of prejudice to Norton on a par with that found in other cases involving Rule 60(b). Compare Rodgers v. Watt, 722 F.2d 456, 460-61 (9th Cir.1983) (en banc) (Nelson, D.W., J.) (excusable neglect where party failed to file notice of appeal in part because no notice of judgment was sent and case was incorrectly docketed). At the hearing itself, Norton did not mention the lack of notice to him. And the case Norton wanted most of all to cite--Schwartzman v. Valenzuela, 846 F.2d 1209 (9th Cir.1988)--is inapposite because it does not involve workplace disruption.
 
 
 15
 The district court did not abuse its discretion.
 
 CONCLUSION
 
 16
 The district court did not err in holding that the law governing Norton's termination was not "clearly established."
 
 
 17
 AFFIRMED.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3