[No. E017954. Fourth Dist., Div. Two. Sept. 3, 1997.]

NORMA KIRCHMANN, Plaintiff and Appellant, v.
LAKE ELSINORE UNIFIED SCHOOL DISTRICT, Defendant and
Respondent.

596

598

**Counsel**

Donal M. Hill for Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, Sherry G. Gordon and Howard J. Fulfrost for Defendant and Respondent.

**Opinion**

**RICHLI, J.**—"Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions . . . ." (*Waters* v. *Churchill* (1994) 511 U.S. 661, 674 [114 S.Ct. 1878, 1887, 128 L.Ed.2d 686, 698] (plur. opn. of O'Connor, J.).) In recognition of that fact, the First Amendment prohibits dismissal of a public employee for criticizing his or her employer unless the employee's free speech interest is outweighed by the employer's interest in avoiding disruption. (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 574 [88 S.Ct. 1731, 1737, 20 L.Ed.2d 811, 820].)

Norma Kirchmann, an employee of the Lake Elsinore Unified School District (District), was suspended for 30 days after she anonymously communicated to bidders on a District construction management contract her view that a conflict of interest existed in the selection process. Although we find the case a close one, in view of the substantial public importance of the subject on which Kirchmann spoke we conclude her right to speak was protected.

I

Factual and Procedural Background

A. *Facts*

Kirchmann became a permanent employee of the District in 1985. In and after July 1994, she worked as a secretary II in the District's facilities department. Normand Tanguay, assistant superintendent for divisions, was her supervisor.

In the spring of 1994, the District was considering retaining an outside firm to act as project manager for school construction projects. Francis & Anderson Architects was already serving as project manager for a new school the District was constructing. Mellissa Truitt, a consultant to Francis & Anderson, had principal responsibility for that project.

Tanguay directed Truitt to pursue the project manager recruitment. Truitt helped rewrite a request for proposals in June 1994. The District received about 18 responses to the request for proposals. Truitt reviewed the responses. Truitt, Tanguay and Joe Busek, the District's controller, made recommendations as to which firms should be interviewed.

Eventually, six firms were selected to be interviewed. The interview panel consisted of Tanguay, Truitt, Harry Wise, the head of maintenance and operations for the District, and Jim DiCamillo, a representative of an outside architectural firm. Francis & Anderson was one of the firms interviewed.

As chair of the panel, Tanguay had the ultimate decision which firm to recommend to the District's governing board (Board). After the panel discussed the applicants, Tanguay asked Truitt to draft a proposed agenda item recommending Francis & Anderson. Truitt gave the draft item to Kirchmann to be typed. As finally submitted to the superintendent of the district for consideration, the item recommended "that Francis & Anderson Architects . . . be chosen as [construction/project management] on all identified future projects."

In the early morning of October 4, 1994, Kirchmann faxed from her home to about 16 of the unsuccessful bidders a document which read: "To whom it may concern: [¶] The Lake Elsinore Unified School District is being given the recommendation to hire Francis & Anderson Architects as the Construction/Project Management firm to handle the proposed projects on the agenda for this district. Normand A. Tanguay is signing the agenda item although it was written by Mellissa Truitt, Project Manager, David A. Brown Middle School and a contracted employee of Francis & Anderson. [¶] As you know, she was one of the persons on the interview panel. She was also the person who checked references for the district and made the major recommendation as to the best firm for the district to hire for this contract. [¶] Since there appears to be a conflict of interest, at least in the professional sense, it might be in the best interest of your company to attend the board meeting on October 11, 1994, at 6:00 p.m. and question the legalities involved."

Ultimately the matter was not placed on the Board agenda, because of a concern there might not be funding for it.

## B. *Procedural History*

In November 1994, the District notified Kirchmann that it proposed to suspend her without pay for 30 days. The notice charged Kirchmann with failure to follow directions of a superior, dishonesty, and misuse or misappropriation of District property. The charge of failing to follow directions was based on Kirchmann's transmission of the fax after having been told by Tanguay in September 1994 that any communication with outside vendors had to be approved by Busek and Tanguay. The charges of dishonesty and misuse of District property were based on Kirchmann's unauthorized use of the list of bidders.

After an administrative hearing, the Board accepted the hearing officer's recommendation that Kirchmann be suspended for 30 days without pay. Kirchmann filed a petition in the lower court seeking a writ of mandamus compelling the District to set aside its decision. The lower court denied relief, concluding that the District's interest in promoting the efficiency of its operations outweighed Kirchmann's free speech interest. Kirchmann appeals.

## II

### DISCUSSION

 To determine whether the First Amendment prohibits Kirchmann's suspension, we must first consider whether her fax addressed a matter of public concern. (*Rankin* v. *McPherson* (1987) 483 U.S. 378, 384 [107 S.Ct. 2891, 2896-2897, 97 L.Ed.2d 315, 323].) If not, her speech was not protected. If, however, Kirchmann did speak on a matter of public concern, we must balance her interest in making her statement against the interest of the District in " 'promoting the efficiency of the public services it performs through its employees.' " (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 388 [107 S.Ct. at p. 2899].) Both the public concern determination and the balancing of interests are subject to independent review on appeal. (*Gray* v. *County of Tulare* (1995) 32 Cal.App.4th 1079, 1090 [38 Cal.Rptr.2d 317].)

## A. *Public Concern*

" 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.' " (*Rankin* v. *McPherson, supra,* 483 U.S. at pp. 384-385 [107 S.Ct. at p. 2897], quoting *Connick* v. *Myers* (1983) 461 U.S. 138, 147-148 [103 S.Ct. 1684, 1690-1691, 75 L.Ed.2d 708].) Content is

" 'the greatest single factor' " in the inquiry. (*Johnson* v. *Multnomah County, Or.* (9th Cir. 1995) 48 F.3d 420, 424.) We turn first to that factor.

### 1. *Content*

"[C]ourts have routinely treated speech which criticizes the substantive operations of the governmental agency as a matter of public concern." (*Southern Cal. Rapid Transit Dist.* v. *Superior Court* (1994) 30 Cal.App.4th 713, 728 [36 Cal.Rptr.2d 665].) "Some of the most important public employee speech" consists of statements "exposing governmental corruption, wrongdoing, or incompetence." (*Hyland* v. *Wonder* (9th Cir. 1992) 972 F.2d 1129, 1138.)

The essential thrust of Kirchmann's fax was that Truitt's participation in the construction manager selection process while she was a consultant to one of the firms under consideration created at least an apparent conflict of interest. As Kirchmann notes, Government Code section 87100 of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) states: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest." Government Code section 87103, in turn, provides: "An official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official . . . ." These provisions are to be "liberally construed." (Gov. Code, § 81003.)

Truitt arguably had a conflict of interest under the above provisions. Although Truitt was not an employee of the District, Government Code section 82048 defines "public official" for purposes of section 87100 to include "every member, officer, employee *or consultant* of a state or local government agency . . . ." (Italics added.) A school district is a local government agency (Gov. Code, § 82041), and it is not disputed that Truitt was a consultant to the District.

Similarly, the selection of a construction management firm arguably would have a "material financial effect" on Truitt. Truitt was already serving as a consultant to the District on a number of matters, pursuant to her consulting relationship with Francis & Anderson. Tanguay delegated responsibility to Truitt to the same degree that he delegated it to District employees, including the controller. It is reasonable to suppose that, if Francis & Anderson were selected, Truitt would benefit financially because Tanguay

and Francis & Anderson would expand her duties to include some or all of the additional services the firm would be providing.

However, we need not and do not decide whether Truitt in fact had a conflict of interest under Government Code section 87100. Section 87100 is significant to our analysis not to establish a substantive violation of the law, but to show the degree of public concern implicated in the content of Kirchmann's fax. Indeed, the California Supreme Court has said: "Beyond doubt, . . . the regulation of 'conflict of interest' . . . (e.g., § 87100 et seq.)—is a statewide concern." (*Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 406, fn. 18 [14 Cal.Rptr.2d 470, 841 P.2d 990].) And a federal court recently held specifically that a possible violation of section 87100 is a matter of public concern for First Amendment purposes. (*Vasquez* v. *City of Bell Gardens* (C.D.Cal. 1996) 938 F.Supp. 1487, 1496; see also *Johnson* v. *Multnomah County, Or., supra,* 48 F.3d 420, 422, 424-425 [employee's statements that her supervisor "was awarding county contracts as paybacks for favors" addressed matter of public concern].) Thus, the fact Government Code section 87100 was arguably implicated here was enough to make the content of Kirchmann's speech a matter of public concern.

We next consider the remaining elements of the public concern inquiry—the form and context of the employee's speech.

### 2. *Form and Context*

Kirchmann spoke not to the public at large, but to a selected group of private parties. However, the fact she did not air her views in a public forum does not necessarily divest her speech of protection. ■ The United States Supreme Court has made clear that a public employee does not forfeit First Amendment protection merely because "he decides to express his views privately rather than publicly." (*Givhan* v. *Western Line Consol. School Dist.* (1979) 439 U.S. 410, 414 [99 S.Ct. 693, 696, 58 L.Ed.2d 619]; see also *Rankin* v. *McPherson, supra,* 483 U.S. at p. 386, fn. 11 [107 S.Ct. at p. 2898] ["The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern."].)

Although Kirchmann disseminated her fax to only a few members of the public, those parties had the greatest incentive to pass the information it contained on to news media or public officials. (In fact, as discussed later, one of the recipients did so.) And the fax suggested the recipients attend the Board meeting and "question the legalities involved," thus advocating public discussion of the information in the fax.

The District argues strenuously that, in fact, Kirchmann's purpose was not to facilitate public discussion but to seek revenge against Tanguay for

allegedly trying to get rid of her during a layoff in July 1994. However, "[i]t is often the case that those who speak out are also involved in personal disputes with employers and other employees." (*Marshall* v. *Porter County Plan Com'n* (7th Cir. 1994) 32 F.3d 1215, 1219.) Consequently, ". . . a plaintiff's speech could be characterized as a matter of public concern even if the speaker stands to gain a personal benefit in addition to bringing the wrongdoing to light." (*Ibid.*)

An employee's personal motive may vitiate the public concern element if "the speech concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee" (*Marshall* v. *Porter County Plan Com'n, supra,* 32 F.3d at p. 1219), or if "the subject matter of a statement is only marginally related to issues of public concern." (*Johnson* v. *Multnomah County, Or., supra,* 48 F.3d at p. 425.) Here, however, Kirchmann's fax did not address only the "personal effect" of the alleged wrongdoing on her, nor was it "only marginally related to issues of public concern." Rather, as we have discussed, it described a possible violation of a Government Code provision which the California Supreme Court has recognized as addressing a matter of statewide interest.

### B. *Balancing of Interests*

■■■ Our remaining task is to determine whether Kirchmann's right to speak was outweighed by the District's countervailing interest in avoiding disruption of its operations. The District bears the burden of persuasion on this issue. (*Johnson* v. *Multnomah County, Or., supra,* 48 F.3d 420, 422; see *Rankin* v. *McPherson, supra,* 483 U.S. 378, 388 [107 S.Ct. 2891, 2899].) Additionally, "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." (*Connick* v. *Myers, supra,* 461 U.S. at p. 152 [103 S.Ct. at pp. 1692-1693]; see also *Hyland* v. *Wonder, supra,* 972 F.2d 1129, 1139; *Gray* v. *County of Tulare, supra,* 32 Cal.App.4th at p. 1093.) Because, as we have seen, Kirchmann's speech directly concerned a matter of significant public importance, the District's burden is correspondingly higher.

The United States Supreme Court in *Pickering* v. *Board of Education, supra,* 391 U.S. 563, expressly declined to articulate a general standard for determining when employee speech is protected. (391 U.S. 563, 569 [88 S.Ct. 1731, 1735].) Later decisions of that court and others identify factors which may be important in particular cases. We discuss those we find applicable here.

#### 1. *Accuracy*

■■■ Absent unusual circumstances, such as an extraordinary need for confidentiality or a particularly sensitive employment position, an employee

may not be discharged for making a statement that is "substantially correct." (*Pickering* v. *Board of Education, supra*, 391 U.S. at p. 570, fn. 3 [88 S.Ct. at p. 1735].) Depending on the degree of disruption it causes, a *negligently* false statement also may be protected. (*Id.*, at p. 574 [88 S.Ct. at pp. 1737-1738].) There is some controversy about whether a *knowingly or recklessly* false statement can be protected, with some courts affording no protection and others permitting protection of reckless misstatements under some circumstances. (See discussion of divergent authorities in *Johnson* v. *Multnomah County, Or., supra*, 48 F.3d 420, 423-424.) As will appear, we need not address that issue, because we conclude that under the appropriate standard, the District did not show Kirchmann's statements were knowingly or recklessly false.

■ Although the lower court made no finding whether Kirchmann acted knowingly or recklessly, the District contends Kirchmann sent the fax "with reckless disregard for the truth" because she "had no true knowledge or understanding of the inner-workings of the District's facilities office," and based the statements in the fax on "baseless assumptions." ■ Those courts which have considered the matter have concluded that in the context of employee speech, the standard for recklessness should be the same as in defamation cases—whether the speaker " 'in fact entertained serious doubts as to the truth of his publication.' " (*Brasslett* v. *Cota* (1st Cir. 1985) 761 F.2d 827, 841, quoting *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [88 S.Ct. 1323, 1325, 20 L.Ed.2d 262]; see also *Moore* v. *City of Kilgore, Tex.* (5th Cir. 1989) 877 F.2d 364, 376.) That language "establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue." (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 257 [208 Cal.Rptr. 137, 690 P.2d 610].) Recklessness may be shown " 'where a story is . . . based wholly on an unverified anonymous telephone call,' " " 'when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation,' " or " 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' " (*Ibid.*, quoting *St. Amant* v. *Thompson, supra*, 390 U.S. at p. 732 [88 S.Ct. at p. 1326].)

■ Kirchmann's statements were not shown to be reckless under this standard. Each of the statements had at least an arguable basis in fact, and many of them were wholly or substantially correct. The District does not dispute the fax correctly stated that Francis & Anderson was being recommended to the District, that Tanguay was signing the agenda item, and that Truitt served on the interview panel. However, it takes issue with a number of the remaining statements, which we therefore address in some detail.

The District first challenges Kirchmann's statement that the agenda item recommending Francis & Anderson "was written by Mellissa Truitt." The

statement was literally true; Truitt initially wrote the item and Tanguay, at most, revised it. The document, as given to Kirchmann for typing, consisted of a paste-up from previous items, combined with inserts which, according to Kirchmann, were in Truitt's handwriting. Although the District claims the document was subject to "substantial" revision by Tanguay, there is no basis in the record for that assertion because Tanguay *could not remember* what revisions he made. Further, Truitt testified her draft contained an error which, apparently, Tanguay failed to correct when he sent the document to the superintendent, suggesting that whatever review he gave the document was not, in fact, very "substantial." At the least, there was insufficient evidence to show Kirchmann had "serious doubts" about whether Truitt wrote the item.

The District further complains that Truitt was not "the" person who checked references as the fax stated. Truitt testified that before the interviews, the selection committee met and Tanguay directed Jim DiCamillo of the District's architectural firm to check references. According to Truitt, DiCamillo said he would "take care of all the architects" and Truitt would "take care of all of the construction management, that type of thing." Truitt testified she did check some references. Most significantly, Truitt's checks included a call to at least one client of Francis & Anderson, the Inglewood Unified School District, to inquire about a job they were doing.

Although the statement that Truitt was "the" person who checked references was not literally true if interpreted to mean she was the *only* person who did so, that is not the only reasonable interpretation of the statement. Moreover, the record is devoid of any suggestion Kirchmann "in fact entertained serious doubts" about the statement's accuracy. There was no showing Kirchmann knew or suspected DiCamillo also was asked to check references.

In any event, the District's distinction between "the" person who checked references and "a" person who did so does not preclude Kirchmann's statement from being "substantially correct" (*Pickering* v. *Board of Education, supra,* 391 U.S. 563) considering the overall thrust of the fax. Kirchmann's point was that, under conflict of interest rules, Truitt should not have been involved at all. The fact someone else also checked some references does not render Kirchmann's statement materially misleading, particularly in view of the fact Truitt checked a reference on her own firm, exactly the kind of potential conflict situation the fax was objecting to.

The District next complains Kirchmann "deceitfully omitted" the fact that the firms interviewed were advised of, and agreed to, Truitt's participation,

and that Truitt "did not participate in rating her own employer [*sic*], Francis and Anderson." Of course, if the firms interviewed in fact were advised of Truitt's participation, the omission of that fact from the fax could not have "deceived" any of those firms. To the extent the omission may have been misleading to the firms not interviewed, one wonders what difference it would have made had the omitted fact been included. Presumably, any objection those firms had to Truitt's involvement after reading the fax would not have been vitiated by the knowledge that other firms—those interviewed—had no such objection.

The District's assertion that Truitt "did not participate" in rating Francis & Anderson is simply not supported. First, Truitt testified that the determination of which firms would be interviewed was made by "group consensus," the group consisting of Tanguay, DiCamillo, Busek, and herself. Truitt stated she "made recommendations" as to which firms should be interviewed. Since Francis & Anderson was one of the firms selected, and other firms were not selected, in any reasonable sense of the word one must conclude Truitt had at least some part in "rating" that firm in comparison to the others.

Similarly, Tanguay admitted Truitt was present for the Francis & Anderson interview and, though she was not permitted to ask questions, did "[g]ive us some feedback after they left." Tanguay also testified Truitt was "satisfied" with the top two or three applicants, one of which was Francis & Anderson. Again, Truitt could not be "satisfied" with Francis & Anderson without, at least in some sense, "rating" their fitness for the job.

Truitt herself testified as follows: "Ms. Gordon [counsel for District]: After the interviews were finished, the six remaining applicants, what happened next? [¶] Ms. Truitt: The selection committee stayed to review the comments and overall just to talk about the vendors and everyone they went around the table and they asked everyone about their opinion of the vendors that had interviewed. Mr. Tanguay asked everyone's opinion overall. [¶] Ms. Gordon: Did you participate in that part of the process? [¶] Ms. Truitt: *Yes.* [¶] Ms. Gordon: And did you comment on your overall recommendation at that point, or did you make general comments about *all applicants*? [¶] Ms. Truitt: *Both.*" (Italics added.)

Finally, Truitt's "overall recommendation," in her own words, was: "My recommendation was um I felt most comfortable with Lear McGovern Bovis's Construction Management um if what I stated at the time was that if the District had a woman present 'a good relationship with Francis & Anderson' *my recommendation was that they team Francis & Anderson with another firm* because I didn't think they had the depth and resources to

provide the program management services required for this particular program." (Italics added.) Although the testimony is ambiguous, it is at least reasonable to interpret it to mean Truitt did recommend her own firm, provided it was "teamed" with another firm.

The District points out the fax stated that Truitt made the "major" recommendation as to the best firm to hire, and argues it is undisputed that, in fact, the recommendation was Tanguay's. Since the conflict of interest statutes direct that an interested party not "participate" in a governmental decision (see Gov. Code, § 87100), whether Truitt made the "major" recommendation or simply offered her opinion was largely irrelevant to the import of the fax. At any rate, the statement in the fax reasonably could be interpreted to mean that although Tanguay made the final recommendation to the *Board*, Truitt made the major recommendation to *Tanguay* due to her greater hands-on familiarity with management of the District's projects. According to Kirchmann, Truitt told her that Truitt "had the major knowledge" and that neither Tanguay nor Harry Wise nor David Long, the District Superintendent, had that knowledge. That testimony was not rebutted. We cannot conclude Kirchmann "in fact entertained serious doubts" about the substantial accuracy of the statement.

It is also worth noting that Kirchmann's relatively subordinate position in the District presumably afforded her only a limited opportunity to investigate the accuracy of her statements. Although one answer to that observation is that in the absence of definitive evidence an employee should refrain from speaking, overzealous application of that approach would suppress many statements of great public importance. As the court said in *Johnson* v. *Multnomah County, Or.*, *supra*, 48 F.3d 420, "while false statements are not deserving, in themselves, of constitutional protection, 'erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive." ' " (48 F.3d at p. 424.)

 Finally, even where an employee makes false statements, the significance of that fact in the First Amendment analysis is diminished where the employer has an effective opportunity to rebut the statements. (*Pickering* v. *Board of Education*, *supra*, 391 U.S. at p. 571 [88 S.Ct. at p. 1736].) Here, the District had, and availed itself of, that opportunity. After learning of the fax, Tanguay sent the unsuccessful applicants a letter, dated October 5, 1994, stating that in view of Truitt's past service to the District, "the District believed it was important for Ms. Truitt to participate in the interview process to ensure that issues she believed were important could be adequately addressed by the firms submitting proposals. Ms. Truitt did not

participate in the evaluation of Francis and Anderson, and the ultimate decision of the firm to be recommended to the Board was made by District staff." According to Tanguay, those firms who called the District after receiving the fax "accepted" the District's position once he explained it to them.

We conclude the District has not shown Kirchmann's statements were not substantially correct, or, to the extent they were incorrect, that she acted recklessly in making them. Accordingly, we find the accuracy factor insufficient in this case to tip the *Pickering* balance in favor of the District.

### 2. *Interference With the District's Operations*

■ The United States Supreme Court has identified as "pertinent considerations" in performing the *Pickering* balancing "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 388 [107 S.Ct. at p. 2899].) In making that determination, the court considers "the manner, time, and place of the employee's expression," as well as "the context in which the dispute arose." (*Ibid.*)[1]

Most recently, in a plurality opinion, four justices of the court observed that, "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." (*Waters* v. *Churchill, supra,* 511 U.S. 661, 675 [114 S.Ct. 1878, 1887-1888].) At the same time, the court has stated, "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 384 [107 S.Ct. at p. 2897].) With those principles in mind, we consider whether Kirchmann's speech so detracted from the District's functioning as to lose First Amendment protection.

### a. *Workplace Harmony*

Employee speech which criticizes a public agency or its officials may disrupt agency operations by undermining authority and destroying working

---

[1]Obviously, these considerations overlap to some degree with the "content, form, and context" criteria employed in deciding whether a statement addresses a matter of public concern. To that extent, we have considered them previously and will not repeat our discussion here.

relationships. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." (*Connick* v. *Myers*, *supra*, 461 U.S. at pp. 151-152 [103 S.Ct. at p. 1692].) At the same time, it is recognized that some disruption of a public office is inevitable in the exposure of wrongdoing, and that the First Amendment demands tolerance of such disruption to at least some degree. (*Czurlanis* v. *Albanese* (3d Cir. 1983) 721 F.2d 98, 105; *Johnson* v. *Multnomah County, Or.*, *supra*, 48 F.3d at p. 427.)

Disruption stemming from criticism of a superior is most intolerable where the subordinate occupies a close working relationship with the superior, or where "discipline and loyalty are especially important," as in a law enforcement agency. (*Gray* v. *County of Tulare*, *supra*, 32 Cal.App.4th at p. 1092; see also *Germann* v. *City of Kansas City* (8th Cir. 1985) 776 F.2d 761, 764-765.) Some cases have found such a relationship between a secretary and his or her supervisor, observing that "[the supervisor's] ability to carry out his public responsibilities would likely be impaired if he were forced to retain a secretary whose loyalty he questioned." (*McDaniel* v. *Woodard* (11th Cir. 1989) 886 F.2d 311, 316 [secretary of state court judge]; see also *McCabe* v. *Sharrett* (11th Cir. 1994) 12 F.3d 1558, 1570 [secretary to chief of police].) ■ Although we do not intend to minimize the disruption Kirchmann's fax must have caused to her working relationship with Tanguay and Truitt, it does not appear her position demanded loyalty beyond that normally demanded of any subordinate employee.

Although Tanguay had day-to-day contact with Kirchmann since July 1994, he did not deal with her on a day to day basis and "didn't really oversee Norma Kirchmann in her day to day performance of her duties." Similarly, Kirchmann apparently provided the majority of Truitt's secretarial support, but not all of it. In neither case was there an indication of a relationship so intimate that *any* criticism by Kirchmann was bound to impair the working relationship. Presumably, if that were the case, the District would have been obliged to terminate or at least reassign Kirchmann after she sent the fax.

Employee speech which challenges a policy of the employer is more likely to threaten authority where it arises from a dispute concerning "the very application of that policy to the speaker." (*Connick* v. *Myers*, *supra*, 461 U.S. at p. 153 [103 S.Ct. at p. 1693]; *Gray* v. *County of Tulare*, *supra*, 32 Cal.App.4th at p. 1095.) Again, that situation was not present here. The challenged conduct had nothing to do with the application of any District policy to Kirchmann.

Finally, speech which occurs at the workplace poses a more immediate threat to authority. "Employee speech which transpires entirely on the

employee's own time, and in nonwork areas of the office, bring different factors into the *Pickering* calculus . . . ." (*Connick* v. *Myers, supra,* 461 U.S. at p. 153, fn. 13 [103 S.Ct. at p. 1693].) Since Kirchmann spoke entirely on her own time, that factor weighs in her favor.

### b. *Confidentiality*

The lower court in upholding Kirchmann's suspension cited, in part, the need for confidentiality in the bidding process. Although undoubtedly information such as the amounts of competitors' bids must be kept confidential, it is difficult to see how Truitt's participation in the selection process could fall into that category. For one thing, Truitt and Tanguay made a point of *telling* at least all of the interviewed firms of Truitt's involvement, indicating they believed it was important information for the bidders to have. Further, as we have seen, Truitt's participation raised at least a possible conflict of interest issue under Government Code section 87100. Even where confidentiality otherwise would be required, a government agency does not have a legitimate interest in concealing wrongdoing. (*Johnson* v. *Multnomah County, Or., supra,* 48 F.3d at p. 427; *Vasquez* v. *City of Bell Gardens, supra,* 938 F.Supp. 1487, 1495.)[2]

### c. *Relations With Outside Parties*

The lower court also cited the need for the District to present a "united front" in its dealings with outside providers, and to maintain the confidence of bidders in the selection process. The court found the timing of Kirchmann's fax, which she transmitted shortly before the selection was to be made, and her communication directly with the unsuccessful bidders rather than in a public forum, suggested her speech was calculated to cause maximum disruption of the bidding process. Though the concerns identified by the court are surely important ones, we cannot conclude Kirchmann's speech so undermined them as to divest her statements of First Amendment protection.

Decisions disagree as to whether and to what extent a public agency must show actual disruption to suppress employee speech. It appears some circuits

---

[2]At oral argument, the District emphasized its contention that Kirchmann dishonestly misappropriated and misused District property when she took the list of unsuccessful bidders from the District office without permission. While a factor to be considered in the balancing analysis, we note under these facts this contention does not warrant much if any weight. Kirchmann could have memorized the information on the list, or obtained it through public channels. Moreover, she took the list not for any personal purpose, but to facilitate dissemination of her speech. As the District concedes, "employees may lawfully abandon confidentiality and loyalty to expose wrongdoing."

would not require actual disruption in every case, at least where disruption reasonably can be presumed from the context of the dispute. (See, e.g., *Germann* v. *City of Kansas City, supra,* 776 F.2d 761, 765 [comments made after employee strike and amidst great turmoil in agency]; see also *Tindle* v. *Caudell* (8th Cir. 1995) 56 F.3d 966, 972; *Jurgensen* v. *Fairfax County, Va.* (4th Cir. 1984) 745 F.2d 868, 878.) The Ninth Circuit, in contrast, requires a showing of "actual injury." (*Johnson* v. *Multnomah County, Or., supra,* 48 F.3d at p. 427; see also *Hyland* v. *Wonder, supra,* 972 F.2d at p. 1140 [" 'actual, material and substantial disruption must be demonstrated.' "].) The only California authority of which we are aware takes the latter position, at least where (as in this case) the employee who speaks is not "a policy-level official with a special working relationship which might justify an 'inference of disruption' . . . ." (*Chico Police Officers' Assn.* v. *City of Chico* (1991) 232 Cal.App.3d 635, 651 [283 Cal.Rptr. 610].) Without taking a definitive position, a plurality of the United States Supreme Court has observed that the court has been more deferential to "predictions" of harm in the context of employee speech than in cases involving speech of the public at large. (*Waters* v. *Churchill, supra,* 511 U.S. 661, 673 [114 S.Ct. 1878, 1886-1887].)

Under the somewhat unusual circumstances here, we conclude it is appropriate to require an actual showing of disruption. In many cases, it may be difficult or impossible to assess the disruption actually caused by a statement widely disseminated either within or without the workplace. Here, however, Kirchmann directed her speech to a limited and easily identifiable audience. Thus, it was relatively easy to determine whether, in fact, the District's relations with those parties were disrupted.

Truitt testified she received calls from four applicants asking what the fax meant. The caller from one company, Vanir Construction Management, was "pretty ticked off that someone sent [the fax] to him and he knew it wasn't true." The Vanir representative also testified at the administrative hearing. He stated Vanir knew of Truitt's ties to a potential competitor before it made its proposal. He believed Truitt acted in an open fashion and tried to find the best company, whoever it might be. The fax contained no information he did not already know.

Similarly, a representative of another unsuccessful applicant appeared at the October Board meeting and "said he was involved, he was interviewed and that he wanted the Board to know that he felt very comfortable with it and it was all done above board with no qualms."

In contrast, another unsuccessful respondent, Davis/Omega Management, upon receipt of the fax wrote to the Board and to the Riverside County

Superintendent of Schools. The letter charged the District, the Board, Truitt and Francis & Anderson with violating conflict of interest laws and demanded that the District reimburse all of the unsuccessful respondents for their costs in preparing their proposals. It indicated copies of it had been sent to, among others, "Ron Packard, U.S. Congress," "Enterprise Newspaper, Investigator Reporter," and "All participants to the RFQ, except Francis & Anderson."

Examination at the hearing, however, established that Davis/Omega knew before it received the fax that Truitt was under contract with Francis & Anderson to provide consulting services to the District and was "involved in reviewing all the documentation and all the proposals." Davis/Omega, in fact, asked Truitt at that time whether her position created a conflict of interest.

We thus confront a record showing that, for the most part, the fax did little to disrupt the District's relationships with the parties to whom it was directed. The only exception shown by the evidence, the adverse reaction of Davis/Omega, could not be wholly attributed to the fax, since the firm had already raised the conflict of interest issue on its own. (See *Wulf* v. *City of Wichita* (10th Cir. 1989) 883 F.2d 842, 861 [where allegations in employee's letter "were already the topic of discussion and concern *before* [employee] wrote his letter," evidence was insufficient to show letter interfered with effective functioning of agency].) Particularly in view of the fact the District could and did promptly transmit its own letter to the applicants explaining its position (see discussion, *ante*), we conclude that whatever disruption the fax may have caused was not sufficient to justify forfeiture of Kirchmann's right to send it.

### d. *Severity of Discipline*

The District asks us to take into account the fact that Kirchmann received only a 30-day suspension rather than a heavier sanction such as dismissal. As we understand the First Amendment jurisprudence, however, the degree of sanction is not relevant. The United States Supreme Court has rejected the suggestion "that only those employment decisions that are the 'substantial equivalent of a dismissal' violate a public employee's rights under the First Amendment." (*Rutan* v. *Republican Party of Illinois* (1990) 497 U.S. 62, 75 [110 S.Ct. 2729, 2737, 111 L.Ed.2d 52].) As the court noted in *Rutan*, the First Amendment prohibits " 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.' " (*Id.*, at p. 75, fn. 8 [110 S.Ct. at pp. 2737-2738].) The significant point is that the sanction

comes in retaliation for the speech. If the speech is protected, any sanction, whatever its severity, is prohibited.

## III

### CONCLUSION

As a public body, this court is particularly concerned with avoiding even the appearance of impropriety in the conduct of the public's business. The potential for impropriety in this case should have been, and was, apparent to the District well before Kirchmann decided to raise the issue. Truitt herself, in fact, became concerned about a possible conflict of interest when she became involved in preparing the revised request for proposals. She expressed her concern to Tanguay at that time.

The District failed to take the most obvious steps to avoid the potential for conflict, either by removing Truitt from the process entirely or inducing her to sever her relationship with Francis & Anderson and become an employee of the District. Instead, it apparently took the view that as long as the six firms interviewed consented, no issue of conflict remained to be addressed.

That approach ignored the fact that conflict of interest rules exist to uphold the public's right to governmental decisions based on merit, not to afford a private right which can be dispensed with by private agreement. The District's failure to resolve the potential conflict also created the opportunity for Kirchmann to step into the breach with her fax, thus laying the groundwork for a legal controversy that could have been avoided had better judgment been exercised.

While we, like the lower court, have reservations about the manner in which Kirchmann chose to express her views, we conclude that authorizing the District to suppress them would, under the circumstances here, work a greater detriment to the public interest. We therefore conclude Kirchmann's right to speak was protected by the First Amendment and the District improperly suspended her based on that speech.[3]

## IV

### DISPOSITION

The judgment is reversed. The matter is remanded to the lower court with directions to issue a peremptory writ of mandate directing the District to set

---

[3]Our conclusion that the First Amendment prohibited Kirchmann's suspension makes it unnecessary to consider her additional arguments that the suspension violated her right of free expression under article I, section 2 of the California Constitution and that the evidence was insufficient to support the District's charges against her.

aside its suspension of Kirchmann and to restore to her all benefits lost on account of that suspension. Costs to appellant.

Hollenhorst, Acting P. J., and McKinster J., concurred.