Marvin A. SMITH, Plaintiff,

v.

SCHOOL DISTRICT OF PHILADEL-
PHIA, School District of Philadelphia
Superintendent David Hornbeck, Phil-
adelphia Board of Education, Phila-
delphia Board of Education President
Floyd Alston, Pennsylvania Federa-
tion of Teachers Local #3 Building
Representative Avi Barr, and Assis-
tant Principal of Carver High School
of Engineering and Science Steven
Miller, Defendants.

No. CIV. A. 98–6456.

United States District Court,
E.D. Pennsylvania.

Aug. 10, 2001.

Marvin A. Smith, pro se.

Andrew M. Rosen, Philadelphia, PA, for Defendants.

## *MEMORANDUM*

DuBOIS, District Judge.

This case arises out of plaintiff's termination from his position on the School Support Team of George Washington Carver High School of Engineering and Science ("Carver") in December 1998. Presently before the Court are defendants' Motions for Summary Judgment. For the reasons that follow, the motions will be granted.

## I.  INTRODUCTION

Plaintiff Marvin A. Smith ("Smith" or plaintiff) is the father of two children who in the fall of 1997 were enrolled at Carver, a "magnet" public high school located at 17th and Norris Streets in North Philadelphia. Complaint ¶¶ 24, 36. He was concerned that racism at Carver was affecting his children and other African–American students at the school. As a result, on January 1, 1998, he wrote a letter to Carver's Principal, Ella Travis, calling for certain changes to be made at Carver. *See* Complaint ¶¶ 37–38; Ex. 2 to Defs.' Mot. for Summ. J.

The focus of plaintiff's letter was his view that "the white/Jewish teachers" at Carver were racist and discriminated against African–American students, who constituted the majority of pupils at the school. The following excerpt is provided as representative of the letter's content:

Dear Mrs. Travis:

\*  \*  \*  \*  \*  \*

The white/Jewish teachers at [Carver] are generally guilty of the following offenses:

(1) Failing miserably to motivate our African–American children to be the best they can be.  Too many white/Jewish teachers have low expectations of our children.  Racial Discrimination!  Racism!

(2) Failing miserably to provide the kind of high quality, interesting, and stimulating learning experiences which would assist students in being successful.  Racism!

(3) Failing miserably to respect and honor the cultural and ethnic value of African–American History Month by assigning the majority African–American student body the task of reporting on the movie Shindler's List, instead of an African–American assignment.  That was blatant disrespect and insensitivity!  Racism!

(4) Failing miserably to recognize the majority African–American student body by allowing a teacher to tell African–American students that affirmative action should be

eliminated! This is another blatant example of white/Jewish teachers misleading our children. Racism!

(5) Failing miserably to regularly and effectively inform the students of the many false representations of this racist country, and the many, many violations of its own [C]onstitution. Acute racial discrimination, rampant violations of its citizens' constitutional rights, unceasing violation of its citizens' human rights are also issues neglected in the curricula and the classroom. Why aren't African–American students taught to protest, boycott, and demonstrate against these American atrocities?

\*    \*    \*    \*    \*    \*

We want these uncaring racist white/Jewish people to take their flawed and ineffective show back to the suburbs where they live! They are systematically destroying our children's spirit and killing their will. This racist system must be stopped by whatever means necessary and possible before additional generations of our children are lost.

\*    \*    \*    \*    \*    \*

Since these white/Jewish people have been our traditional enemy, why are they so eager to accept the "teaching positions" at schools where African–Americans are predominantly enrolled? They are not there because they love or care about our children! They are there because oppressors need to oppress!

We must stop the oppressors and the oppression!

\*    \*    \*    \*    \*    \*

We—African–Americans—must control the educational institutions that are ours! If we fail to effectively control OUR INSTITUTIONS OF LEARNING we are surely doomed to continue our lives depending on white/Jewish people and following their directions. We must be the master of our fate and absolutely must be the captain of our soul!

I am amenable to meeting with you, at your earliest convenience, to discuss the contents [of] this letter,

AMANDLA—THE POWER IS OURS!

MARVIN A. SMITH (signed)

In June, 1998, nearly six months after plaintiff wrote the letter, plaintiff was elected by a vote of parents of Carver students as president of Carver's Home and School Association. *See* Complaint ¶ 40. At or about the same time, plaintiff was appointed to serve on the School Support Team at Carver ("Carver Support Team" or "the Team").[1] There is little evidence regarding plaintiff's role on the Team, and no evidence regarding when plaintiff was appointed to that position, or who made the appointment. *See* Complaint ¶ 44; Dep. of Marvin A. Smith at 28–30 (describing his role on the Carver Support Team) (Ex. 30 to Defs.' Mot. for Summ. J.).

Soon after plaintiff assumed these roles, he began advocating for the removal of certain Carver staff members. Plaintiff circulated petitions calling for the termination of selected administrators and

---

**1.** In the Complaint, plaintiff refers to this body as the "Advisory Panel." In support of their Motion for Summary Judgment, defendants present substantial evidence that the proper name for the Advisory Panel is the Carver School Support Team. *See* Dep. of Marvin A. Smith at 25–26 (referring to the school support team) (Ex. 12 to Defs.' Mot. for Summ. J.); Ex. 29 to Defs.' Mot. for Summ. J. (documents relating to the Carver Support Team).

teachers at the school, including defendant Steven Miller, Carver's Assistant Principal, and defendant Avi Barr, a teacher at Carver and the building representative for the Philadelphia Federation of Teachers Local #3. *See* Complaint ¶ 41; Letter from Marvin A. Smith dated Dec. 1, 1998 (advocating for the removal of Steven Miller, Sylvan Kesilman, Alex Saddic, Rochelle Katz and Avi Barr) (Ex. 3 to Defs.' Mot. for Summ. J.). One such petition, dated December 1, 1998, was written in the form of a letter. Following is an excerpt from that document:

> Dear Mrs. Travis:
>
> We, the Parents, Guardians and Friends of students enrolled at [Carver], hereby demand the termination, resignation or transfer of Steven Miller from his position as the assistant principal at Carver. He is a major divisive and negative force at Carver.
>
> \*    \*    \*    \*    \*    \*
>
> We, the Parents, Guardians and Friends of students of Carver have regularly observed Steven Miller's acute inhospitality. He walks through Carver—where Our Precious Children are enrolled—and acts like Parents, Guardians and Friends of Carver are invisible. He simply ignores us! That is completely and absolutely unacceptable! Steven Miller is extremely uncomfortable around Parents, Guardians and Friends of Carver. He is hostile, mean-spirited, and downright disrespectful of Parents, Guardians and Friends of students enrolled at Carver.
>
> \*    \*    \*    \*    \*    \*
>
> We, the Parents, Guardians and Friends of students enrolled at Carver also very

strongly demand the termination, resignation or transfer of ... Avi Barr....

> We, the Parents, Guardians and Friends of students enrolled at Carver demand that Steven Miller, the Carver assistant principal, be terminated, transferred or asked to resign ....

At some point in late November or early December, plaintiff's letter to principal Ella Travis dated January 1, 1998 was made public. Aff. of Patricia D. Harris ¶ 6 (Ex. 29 to Defs.' Mot. for Summ. J.).[2] Then, on December 7, 1998, the Philadelphia Board of Education, chaired by President Floyd Alston, unanimously passed a resolution condemning plaintiff, terminating his "official standing in the School District of Philadelphia," and calling upon Carver's Home and School Association to remove him from his post as its president. The Board's resolution, reproduced in its entirety, was as follows:

> The Philadelphia Board of Education and Superintendent deplore and condemn the actions of Mr. Marvin Smith, President of the Home and School Association at George Washington Carver High School. Mr. Smith has chosen to express his concerns about Carver High School through a most inflammatory letter to the principal. This letter contained not only prejudicial statements but, was clearly racist and anti-Semitic. In both spirit and word it offends us personally, the entire School District community and all those we serve. In light of these facts, the Board calls upon the Home & School Council to act swiftly and appropriately by removing Mr. Smith as President of the Carver Home & School Association. Furthermore, the Board and the Superintendent are resolved that Mr. Smith shall have no

---

**2.** Patricia D. Harris is employed by the School District of Philadelphia as an Administrator for the Office of School Support. Aff. of Patricia D. Harris ¶ 1 (Ex. 29 to Defs.' Mot. for Summ. J.).

official standing in the School District of Philadelphia from this point forward.

Statement of the Board of Education adopted Dec. 7, 1998 (Ex. 4, to Defs.' Mot. for Summ. J.).

It is undisputed that at or about the time the resolution was passed, plaintiff was removed from his position on the Carver Support Team. In addition, on December 9, 1998, Carver's Home and School Association sent a letter to the parents of the students at Carver informing them that they had removed plaintiff as its president. *See* Letter to Parents & Guardians from the Executive Board of the Carver Home and School Association dated Dec. 9, 1998 ("Letter to Parents & Guardians") (Ex. 26 to Defs.' Mot. for Summ. J.).

## II. PROCEDURAL HISTORY

On December 11, 1998, plaintiff filed a Complaint (Document No. 1) demanding compensatory damages, punitive damages, attorney's fees and costs in excess of $10 million. The Complaint asserts seven causes of action. The School District of Philadelphia, School District Superintendent David Hornbeck ("Hornbeck"), the Philadelphia Board of Education, Board President Floyd Alston ("Alston"), Avi Barr ("Barr"), and Steven Miller ("Miller") (collectively the "School District defendants") are named in all seven counts.[3]

3. Plaintiff originally filed his lawsuit against fourteen defendants. By agreement of the parties, the following originally named defendants were dismissed by Order dated May 10, 1999 (Document No. 25): National Association for the Advancement of Colored People ("NAACP"); Jerry Mondesire, President of NAACP; Philadelphia Federation of Teachers Local #3 ("PFT"); Jerry Jordan, PFT Vice President; Jewish Community Relations Council ("JCRC"); Burt Siegal, Executive Director of JCRC; Anti–Defamation League of B'Nai B'rith ("ADL"); Barry Morrison, Regional Director of ADL.

Plaintiff sues all non-institutional defendants in their individual and official capacities. *See* Complaint ¶¶ 1; 47–53.

On February 4, 1999, the School District defendants filed an Answer to plaintiff's Complaint (Document No. 11). The Answer contained several affirmative defenses, including the defense of failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Also on February 4, 1999, the School District defendants filed a joint motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Those defendants argued in their motion that plaintiff failed to state a claim upon which relief could be granted. The Court, by Memorandum and Order dated September 5, 2000, granted in part and denied in part defendants' joint motion for judgment on the pleadings. *See Smith v. School Dist. of Phila.*, 112 F.Supp.2d 417 (E.D.Pa.2000). In that Memorandum and Order, the Court dismissed all but one part of one of plaintiff's claims—the only claim not dismissed was plaintiff's claim against the School District defendants for retaliating against him in violation of the First Amendment by terminating him as a member of the Carver Support Team because of the contents of his January 1998 letter (part of Count 6).[4]

4. The claims that were dismissed are plaintiff's claims of a violation of § 1985(3) (Count 1); intentional infliction of emotional distress (Count 2); negligent infliction of emotional distress (Count 3); defamation of character (Count 4); plaintiff's claim brought directly under the Fifth and Fourteenth Amendments of the United States Constitution (Count 5); plaintiff's § 1983 claims grounded on (a) due process violations, (b) equal protection violations, (c) denial of plaintiff's First Amendment right to petition the government for redress of grievances, and (d) plaintiff's claim of First Amendment retaliation based on plaintiff's removal as president of the Carver Home and

The School District defendants filed a Motion for Summary Judgment (Document No. 34) on March 9, 2001; on March 13, 2001, defendant Avi Barr filed a Motion for Summary Judgment (Document No. 35) in which he incorporated by reference defendants' previously filed motion for summary judgment. In response, on March 30, 2001, the Court received a letter from plaintiff dated March 27, 2001, that stated, in pertinent part, the following:

> Please be informed that I, Marvin A. Smith, absolutely oppose the Motion for Summary Judgement that has been advanced by Andrew Rosen, attorney for the defendants—the School District of Philadelphia.
>
> I respectfully oppose this Motion for Summary Judgement because I will be prepared, in due course, to present sufficient evidence to fully justify the allowance of this case to go to a jury.

Upon receipt of this letter, by Order dated April 2, 2001, the Court instructed plaintiff to file and serve a response to defendants' motions for summary judgment within thirty (30) days and ordered that "in the event, plaintiff, Marvin A. Smith, fails to present the Court with the details of his evidence and legal authority in opposition to the Motion for Summary Judgment, the Court will decide the Motion for Summary Judgment based on the submissions of the moving defendants." *See* E.D. Pa. Local Civil Rule 7.1(c) ("In the absence of timely response, [a] motion may be granted as uncontested except that a summary judgment motion, to which there has been no timely response, will be governed by Fed.R.Civ.P. 56(c)."). Notwithstanding that Order, plaintiff failed to provide the Court with the details of his evidence and legal authority. Accordingly, the Court will decide defendants' summary

judgment motions based on their submissions.

## III. STANDARD OF REVIEW

"[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" summary judgment shall be granted. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that Rule 56(c) requires "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987) (citing *Anderson* and *Celotex Corp.*).

In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970) (quoting *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

School Association (Count 6); and invasion of privacy (Count 7).

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). On the other hand, if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

## IV. ANALYSIS

### A. The Carver School Support Team

■ As discussed above, the only issue remaining in the case is whether defendants' actions in removing plaintiff from his position on the Carver Support Team because of the contents of plaintiff's January 1998 letter constituted unconstitutional retaliation in violation of the First Amendment.

By way of background, the Carver Support Team was established in 1998 because Carver had failed to meet performance standards. *See* Letter from Superintendent David Hornbeck to Staff and Friends of the Carver School dated Sept. 18, 1998 (Ex. 29 to Defs.' Mot. for Summ. J.) (explaining that Carver had not met its "two-year performance target" and, for that reason, was identified to participate in the school support process); Dep. of Marvin A. Smith at 25 (Ex. 8 to Defs.' Mot. for Summ. J.). The Team "was composed of parent and community representatives as well as union representatives and School District administrators." Aff. of Patricia D. Harris ¶ 3 (Ex. 29 to Defs.' Mot. for Summ. J.).

The Carver Support Team endeavored to evaluate Carver's performance by meeting with staff and parents from Carver; interviewing teachers and students; and distributing a survey to staff and parents. *See* Aff. of Patricia D. Harris ¶ 4 (Ex. 29 to Defs.' Mot. for Summ. J.); Dep. of Marvin A. Smith at 29 (Ex. 30 to Defs.' Mot. for Summ. J.). Based on the information collected, the Carver Support Team prepared a report with recommendations that it submitted to the principal and staff at Carver. Aff. of Patricia D. Harris ¶ 5 (Ex. 29 to Defs.' Mot. for Summ. J.).

At his deposition, plaintiff testified that the only reason that he was placed on the team was that he was the Carver Home and School Association President. *See* Dep. of Marvin A. Smith at 25–26 ("Only the Home and School President could be placed on the counsel from the school to my knowledge.") (Ex. 8 to Defs.' Mot. for Summ. J.). At some point in late November or early December 1998, after the Carver Support Team had submitted its report and recommendations to the principal and staff at Carver, plaintiff's January 1, 1998 letter was made public. Aff. of Patricia D. Harris ¶ 6 (Ex. 29 to Defs.' Mot. for Summ. J.). The Philadelphia Board of Education then passed a resolution on December 7, 1998 in which it condemned plaintiff, removed plaintiff from his position on the Team, and called upon the Carver Home and School Association to remove plaintiff from his post as president.

### B. First Amendment Retaliation Claim

■ Plaintiff claims his removal from the Team constituted unconstitutional retaliation against him for the protected exercise of his First Amendment rights. In response, the School District defendants argue that they had the right to remove plaintiff from the Carver Support Team as a matter of law and that there are no material issues of fact in dispute; accordingly, they move for summary judgment.

In evaluating a First Amendment retaliation claim such as this one, the inquiry must focus on "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir.2000). The Court first turns to plaintiff's status in the school district and the relationship between plaintiff and the defendants.

### 1. Plaintiff's Status in the School District

■ The Court has previously determined that "[a]lthough plaintiff had a quasi employee-employer relationship with the School District of Philadelphia and the Philadelphia Board of Education as a member of Carver's [School Support Team], he at all times remained a private citizen." *Smith*, 112 F.Supp.2d at 431 (footnote omitted). The question in this case is thus whether the opportunity to serve on Carver's School Support Team is a governmental benefit or privilege, the deprivation of which may trigger constitutional scrutiny. The Court concludes that it is.

The Supreme Court has long held that the "government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *see also Connick v. Myers*, 461 U.S. 138, 144, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983) (" 'the denial of or placing of conditions upon a benefit or privilege' " can violate the First Amendment) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963)). Accordingly, the Supreme Court has recognized a variety of public benefits which cannot be denied because of the recipient's

exercise of a constitutional right. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327 n. 6, 22 L.Ed.2d 600 (1969) (welfare benefits); *Sherbert*, 374 U.S. at 404–05, 83 S.Ct. at 1794–95 (unemployment benefits); *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) (tax exemptions).

With respect to the deprivation of the opportunity to serve as a public volunteer, the Ninth Circuit has explained that,

[t]he injury to position or privilege necessary to activate the First Amendment . . . need not rise to the level of lost employment. Retaliatory actions with less momentous consequences, such as loss of a volunteer position, are equally egregious in the eyes of the Constitution because a person is being punished for engaging in protected speech.

*Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir.1992). In *Hyland*, Lanric Hyland ("Hyland") had worked as a volunteer for the San Francisco Juvenile Probation Department for a lengthy period of time prior to circulating a memorandum critical of the director of the San Francisco Juvenile Hall. Upon receipt of the memorandum, the Chief Probation Officer, Dennis Sweeney ("Sweeney"), of the Juvenile Probation Department informed Hyland that Hyland's "relationship with the Juvenile Court is finished" and that Sweeney planned "to issue a memorandum stating [Hyland is] not to be allowed into Juvenile Hall ever again." *Id.* at 1133. In evaluating plaintiff's claim, the Ninth Circuit concluded that "the opportunity to serve as a volunteer constitutes the type of governmental benefit or privilege the deprivation of which can trigger First Amendment scrutiny." *Id.* at 1135.

■ Other courts that have considered the issue have also concluded that the Constitution guarantees public volunteers protection against the deprivation of a vol-

unteer position on the basis of that person's exercise of his or her First Amendment right to free speech. *See Gratsch v. Hamilton County*, 2001 WL 406440 (6th Cir. Apr.3, 2001) (unpublished)[5] ("Although Gratsch was more of an independent contractor or volunteer, rather than an employee, the district court appropriately analyzed his claims under the test applied to employee speech. His relationship with the state in this context resembled an employer-employee relationship more than it resembled the relationship between sovereign and private citizen."); *Andersen v. McCotter*, 100 F.3d 723 (10th Cir.1996) (concluding that an intern who received a part-time salary is entitled to First Amendment protection); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir.1979) (affording volunteer firefighter First Amendment protection).

In this case, the Court concludes that plaintiff's service on the Carver Support Team is the type of governmental privilege or benefit the deprivation of which triggers First Amendment scrutiny. Since he was acting as a volunteer member of the Team and thus had a quasi-employment relationship with the school district, the Court analyzes plaintiff's claim of retaliation under the well-established standards that restrict government regulation of public employee speech. *See generally Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708; *see also Gratsch*, 2001 WL 406440.

### 2. *Government Regulation of Public Employee Speech*

■ It is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687; *see also Baldassare v. New Jersey*, 250 F.3d 188 (2001). However, in its role as employer, the state has "far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994).

■ A public employee's retaliation claim must be evaluated in three steps. *Baldassare*, 250 F.3d at 194. As explained by the Third Circuit:

First, plaintiff must establish the activity in question was protected. For this purpose, the speech must involve a matter of public concern. Once this threshold is met, plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees.

*Baldassare*, 250 F.3d at 195 (citations omitted). Finally, plaintiff must "show the protected activity was a substantial or motivating factor in the alleged retaliatory action." *Id.*

With respect to the final element of this three-part analysis, it is undisputed that plaintiff was removed from his position on the Carver Support Team because of the contents of the letter that he wrote to Carver's principal in January 1998. *See* Statement of the Board of Education adopted Dec. 7, 1998 (Ex. 4 to Defs.' Mot. for Summ. J). The Court now turns to the first two parts of the test, starting with the question whether plaintiff's speech involved a matter of public concern.

---

**5.** The Court notes that unpublished opinions have no precedential value and that under Rule 28 of Court for the Court of Appeals of the Sixth Circuit "[c]itation of unpublished decisions in briefs and oral arguments ... is disfavored." Nevertheless, this Court finds the opinion instructive.

### a. Matter of Public Concern

As set forth *supra* Part I, plaintiff's January 1998 letter stated that the white/Jewish teachers at Carver were "guilty" of a number of offenses and alleged that Carver's teachers were racist and uncaring towards the majority African–American student body at Carver. The issues addressed in the letter, which included, *inter alia,* the quality of the teaching faculty at Carver, the morale of African–American students at the school, and plaintiff's concerns about the oppression of African–American students, are without question matters of public concern and thus entitled to First Amendment protection. As the Court concluded in considering the motion to dismiss:

> [T]he Court notes at the outset that it does not condone the viewpoints expressed in plaintiff's letter to Principal Travis and in the petitions calling for the removal of certain Carver staff members. Nevertheless, the Court finds that these documents concerned matters of public interest—e.g., the School District and Board of Education's policies regarding the hiring of African–American teachers. As such, these documents were protected by the First Amendment.

*Smith,* 112 F.Supp.2d at 431. Plaintiff has thus established the first element of his First Amendment retaliation claim—his speech involved a matter of public concern.

### b. Balance Between Plaintiff's Rights and the School's Interests

The Supreme Court explained in *Pickering* that "[t]he problem in any case is to arrive at a balance between the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35; *see Connick,* 461 U.S. at 140, 103 S.Ct. at 1686; *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987).

Plaintiff cannot establish that his interest in the speech at issue in this case outweighs the school's interest in fair and efficient functioning of the Carver Support Team, Carver and the school district. Rather, the Court concludes that the School District defendants' interests significantly outweigh plaintiff's interest in the statements at issue. In evaluating a statement, the Supreme Court has recognized the following as pertinent considerations:

> whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

In this case, the criteria identified by the *Rankin* Court heavily weigh in favor of the School District defendants. As discussed above, plaintiff was a member of a team specifically created for the evaluation of Carver as a result of Carver's failure to meet its performance goals. The Carver Support Team was responsible for meeting with staff and parents from Carver, interviewing teachers and students, and distributing a survey to staff and parents. The maintenance of healthy working relationships with the other team members, teachers, administrators, and parents at Carver was thus essential to plaintiff's performance of his responsibilities on the Carver Support Team. *See* Dep. of Marvin A. Smith at 30–31 (acknowledging that part of his role on the Carver Support Team was to work cooperatively with teachers to correct problems at Carver).

Furthermore, it is undisputed that plaintiff's statements created a significant disturbance at Carver and in the Philadelphia School District. After the contents of plaintiff's letter were made public, the school district had to devote substantial time and resources to respond to plaintiff's letter and the disruption that his statements caused. As explained by Floyd Alston, who served as President of the Philadelphia Board of Education at all times relevant to this case: "Mr. Smith's letter had the effect of interfering with the regular operation of Carver High School and the District generally by distracting administrators, teachers and parents alike from focusing on improving the instructional program at Carver and throughout the District." Aff. of Floyd Alston ¶ 3 (Ex. 34 to Defs.' Mot. for Summ. J.). For example, the Board of Education reacted swiftly with the passage of a resolution condemning plaintiff's actions. *See* Statement of the Board of Education adopted Dec. 7, 1998 (Ex. 4 to Defs.' Mot. for Summ. J.). In addition, the Superintendent of the Philadelphia Public Schools, David Hornbeck, wrote letters on behalf of the school district to all of the teachers and parents at Carver to allay their concerns. *See* Letters from David Hornbeck dated Dec. 7, 1998 (Ex. 7 to Defs.' Mot. for Summ. J.).

Moreover, many of the teachers and staff members at Carver and administrators in the Philadelphia School District were offended by plaintiff's statements and concerned about their disruptive effects. *See* Aff. of Jacques Lurie ¶ 2 ("I found the letter racist and anti-Semitic in its content and potentially disruptive to the school improvement efforts at Carver.") (Ex. 34 to Defs.' Mot. for Summ. J .); Aff. of Avi Barr ¶ 2 ("I found the contents of his letter offensive.") (Ex. 34 to Defs.' Mot. for Summ. J.); Aff. of Floyd Alston ¶ 2 ("I found the content of the letter offensive and potentially disruptive to the improvement efforts at Carver. Mr. Smith's letter was filled with racist and anti-Semitic statements that were totally contradictory to the very mission of the public school system to provide equal educational and employment opportunity.") (Ex. 34 to Defs.' Mot. for Summ. J.).

Even the National Association for the Advancement of Colored People and the Jewish Community Relations Council called a meeting to address plaintiff's actions. That meeting was subsequently cancelled by the Carver Home and School Association because that body felt the meeting "would not be conducive to the healing process that is needed at this time." Letter to Parents & Guardians (Ex. 26 to Defs.' Mot. for Summ. J.).

Defendants presented a substantial amount of uncontroverted evidence to establish that plaintiff's statements were significantly disruptive and that, given the nature and purpose of the Carver Support Team, plaintiff's views made him unfit for continued service on that body. *See generally Fales v. Garst*, 235 F.3d 1122, 1124 (8th Cir.2001) (per curiam) (holding that teachers' interest in speech, which resulted in "school factions" and disharmony, "was outweighed by the interest of efficient administration of the middle school"). Having determined that the School District defendants' interests substantially outweigh plaintiff's interest in his speech, the Court concludes that plaintiff's termination from his position on the Carver Support Team did not violate his rights as guaranteed by the First Amendment. Accordingly, summary judgment will be granted and judgment will be entered in favor of the School District defendants—the School District of Philadelphia and the Philadel-

phia Board of Education,[6] and defendants David Hornbeck, Floyd Alston, Avi Barr and Steven Miller.

### C. The School District's Potential Liability for Plaintiff's Speech

Defendants also argue that due to plaintiff's quasi-employment relationship with the school district, he was subject to the school district policy on harassment. It is defendants' position that plaintiff's statements may have exposed the school district to liability under Title VII. On the present state of the record, it is difficult to discern whether the school district could have been held liable for plaintiff's actions and/or recommendations. In light of the Court's conclusion that the School District defendants did not violate plaintiff's First Amendment right to free speech, on the present state of the record, the Court declines to reach the question whether the possibility of liability under Title VII would have provided further justification for plaintiff's termination.

### V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment and defendant Avi Barr's Motion for Summary Judgment will be granted. An appropriate order follows.

### ORDER

AND NOW, this 10th day of August, 2001, upon consideration of Defendants' Motion for Summary Judgment (Document No. 34, filed March 9, 2001) and defendant

Avi Barr's Motion for Summary Judgment (Document No. 35, filed March 13, 2001), for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Document No. 34) and defendant Avi Barr's Motion for Summary Judgment (Document No. 35) are **GRANTED** and judgment is **ENTERED** in **FAVOR** of defendants School District of Philadelphia, David Hornbeck, Philadelphia Board of Education, Floyd Alston, Avi Barr, and Steven Miller and **AGAINST** plaintiff Marvin A. Smith.

---

**6.** The Court notes defendants' argument that the Philadelphia Board of Education may not be sued in its own right. Defendants rely on *Glickstein v. Neshaminy School Dist.,* 1997 WL 660636 (E.D.Pa. Oct.22, 1997), in which the court, interpreting Pennsylvania Rules of Civil Procedure 76 and 2102(b), concluded that school district boards of directors are not amenable to suit under Pennsylvania law.

The *Glickstein* court concluded that because the school board lacked "the status of a political subdivision, it lack[ed] corporate existence independent from the School District." *Id.* at *4. Having concluded that the School District defendants in this case did not violate plaintiff's First Amendment rights, the Court declines to reach this issue as it is not relevant to the outcome of the case.